Emanuel D. GRANGER, Appellant,

v.

ITT CONTINENTAL BAKING
COMPANY, Respondent.

No. KCD 27101.

Missouri Court of Appeals,
Kansas City District.

May 3, 1976.

George H. Miller, Sedalia, Hensley &
Rahm, Warrensburg, for appellant.

A. Warren Francis, Lloyd A. Hamrick, Stephen S. Brown, Kansas City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

The appellant (hereafter plaintiff), after a jury trial, was awarded a verdict and judgment for $4,000.00 damages for personal injuries sustained in a collision between an automobile being operated by him and a bread truck owned by the respondent (hereafter defendant), and being operated by its employee, John Delbert Shores (hereafter Shores). This cause was submitted to the jury solely upon the theory of humanitarian negligence, in Instruction No. 4. The trial court sustained defendant's motion for a new trial for the reason (without further elaboration in the record) that "an error was made in submitting Instruction No. 4". From this order, plaintiff appeals, asserting as reversible error that Instruction No. 4 was a proper instruction, was not a deviation from MAI, and in the alternative, if it was a deviation, defendant was not prejudiced thereby.

A resolution of the problem thus presented necessitates a summary of the evidence as to the liability factors in this case.

On September 23, 1972, at about 2:15 p. m., the plaintiff was driving his 1972 Dodge automobile in an easterly direction upon U.S. Highway No. 69 near Fishing River in Clay County, Missouri. He was a member of the Air Force, stationed at Whiteman Air Force Base, and he and three other service men were en route to Excelsior Springs, Missouri. At the point of the collision, No. 69 is a divided highway with two lanes eastbound and two westbound, divided by a median strip; the paved portion of the eastbound lanes is 24 feet in width; there is a driveway apron on the south side of the highway about ten feet in width giving ingress and egress to and from a filling station-cafe establishment; there is a crossover north of this drive to the west-bound lanes of No. 69; approximately 323 feet west of this driveway a girdered bridge carrying eastbound vehicles crosses the river; and west of this bridge there was a 55 m. p. h. speed limit sign controlling eastbound traffic.

The weather was clear and the pavement dry on the afternoon here involved. There was no obstruction to vision in either direction from the east end of the bridge to the filling station-cafe driveway, although the visibility from the east of a car on the bridge would be somewhat obstructed by the bridge girders.

The plaintiff testified that west of the bridge his speed was 60–70 m. p. h.; that in obedience to the speed-sign, he slowed his car; that as he came off the east end of the bridge, traveling in the right eastbound lane, he saw the defendant's truck stopped in the filling station driveway with its front end about 5 feet south of the pavement; that he proceeded eastbound until his car was 150 to 200 feet from the point of collision, traveling at a speed of 50–60 m. p. h., when the truck started up toward the highway; that he hit his brakes, honked his horn and swerved to the right (south), then realized he did not have room to pass behind the truck; that he then swerved to the left (north), but another vehicle was in the median crossover, headed south, facing the bread truck, so that the plaintiff could not use that area to avoid collision; and, that at the time he went through these various maneuvers, the truck had again stopped completely blocking the right eastbound lane (in which the plaintiff had been traveling) and partially blocking the left eastbound lane. The plaintiff stated that "I hit him", the points of impact being the right front of his car and the left front wheel and forward on the truck.

The defendant's driver, Shores, testified that after making a bread delivery to the cafe south of the point of collision, he drove north from its parking area, stopped his truck with the front end about 10 feet south of the south pavement of the highway and looked for cross traffic, observed

none, and started up, attaining a speed of 2–5 m. p. h.; that he then observed plaintiff's vehicle just coming off the end of the bridge to the west, applied his brakes and brought the truck to a stop with the front end approximately two feet south of the center line between the two eastbound lanes; that he heard the plaintiff's brakes "squealing" about the time he stopped the truck; and that the plaintiff's car followed a fairly straight line into the collision from the time he observed it.

The highway patrolman who investigated the accident placed the majority of the debris or "shakedown" in the right (or south) eastbound lane with some north of the center line.

An eastbound motorist testified that the plaintiff passed him about a mile west of the bridge at a speed of 75–80 m. p. h., and the operator of the filling station stated that the speed of the plaintiff's car at the east end of the bridge was 75–80 m. p. h.

Instruction No. 4, as given to the jury, is as follows:

"Your verdict must be for the plaintiff whether or not plaintiff was negligent if you believe:

First, plaintiff was in a position of immediate danger of being injured and was injured, and

Second, defendant knew or by using the highest degree of care could have known of such position of immediate danger, and

Third, at the moment when defendant first knew or could have known of *such position of immediate danger*, defendant still had enough time so that by using the means available to him and with reasonable safety to himself and all others and by using the highest degree of care, he could have avoided injury to the plaintiff *by remaining to the south of Highway 69 until after the automobile in which plaintiff was riding had passed*, and

Fourth, defendant negligently failed to *so remain to the south of said highway 69 until after the automobile in which plaintiff was riding had passed*, and

Fifth, plaintiff's injury directly resulted therefrom." (Emphasis supplied)

This instruction was obviously modeled after MAI 17.14 and 17.15, except for the emphasized portions above noted.[1] In the model MAI 17.14, the acts which defendant could have taken to avoid injury to plaintiff are "slackening his speed and swerving", followed by this comment in "Notes on Use":

"Other acts which may be hypothesized include: stopping, swerving, slackening his speed, sounding a warning, and appropriate combinations."

Further, in the "Committee's Comments" following MAI 17.14, it is pointed out that the term "immediate danger", as used therein, is substituted for the traditional term "imminent peril", as theretofore used in humanitarian negligence submissions, in order to avoid the necessity of an instruction defining "imminent peril" as "certain and immediate danger". The terms in this context are obviously synonymous.

Defendant strongly asserts (among other things) that Instruction No. 4 represents an unwarranted deviation from MAI 17.14, and 17.15, with reference to the hypothesis that plaintiff was in "immediate danger" when defendant's truck was stopped, and that defendant could have avoided injury to plaintiff by remaining stopped south of the highway. The plaintiff argues that the deviation from MAI was necessary and not prejudicial to the defendant.

Counsel have not cited and independent research has not disclosed any decision where humanitarian negligence has been based upon a factual situation where the defendant in a stopped position off the paved portion of a highway is charged with negligence under the humanitarian doctrine

---

1. The basic difference in these two MAI instructions is that 17.14 is a compound submission whereas 17.15 is a disjunctive submission.

for failure to remain in such stopped position.

It is obvious that the selection of hypothesized acts of negligence charged against defendant which might bring the doctrine into play depends upon the circumstances disclosed by the evidence in each case. But a necessary prerequisite in every case before humanitarian negligence can be applied is that the plaintiff be in a position of *immediate danger.* But this, is meant that the danger must be "imminent, certain, immediate and impending", and a bare possibility or likelihood of injury does not satisfy that first and basic requirement. Further, it is the burden of the plaintiff to show when and where he came into immediate danger "as well as to show that defendant had the ability to warn or swerve" or take other action to avoid injury. *Leap v. Gangelhoff,* 416 S.W.2d 65, 67[1, 2, 3] (Mo. 1967); *Dixon v. Kinker,* 410 S.W.2d 347, 351[8] (Mo.App.1966); *Woods v. Dalton,* 331 S.W.2d 132, 138[6, 7] (Mo.App.1960).

Generally, the point of plaintiff's position of immediate danger (or imminent peril) is for the jury to determine. *Kuehn v. Hahn,* 380 S.W.2d 445, 448[3] (Mo.1964); *Leap v. Gangelhoff,* supra. However, MAI 17.14 and 17.15 do not authorize or require the hypothesis of the particular facts by which the plaintiff meets his burden of proof in this regard.

Likewise, it is for the jury to decide whether once defendant either had actual or constructive knowledge of plaintiff's immediate danger, he could have avoided injury to the plaintiff by the particular means submitted. *Bougeno v. Thompson,* 499 S.W.2d 506, 509[2] (Mo. banc 1973).

Applying these basic rules of humanitarian negligence to the evidence in this case, the plaintiff could not have been in any position of immediate danger when he emerged from the east end of the bridge and the truck was stopped 5–10 feet south of the pavement of Highway No. 69. The first point where such danger obtained could only have been when the truck started up and began moving into his path at a speed of 2–5 m. p. h. when the plaintiff, according to his testimony, was 150–200 feet west of the point of impact. It was at that time that the humanitarian doctrine imposed an obligation upon defendant to act by swerving, slackening speed or any other acts within the purview of that doctrine. See: *Wyckoff v. Davis,* 297 S.W.2d 490 (Mo.1957). If the ability to so act to avoid injury had been established by evidence, it would have been proper to submit MAI 17.14, without deviation, as the verdict directing instruction. If such facts were not established, the plaintiff would have been relegated to a primary negligence submission. Since a humanitarian situation did not exist until the truck moved toward the path of the plaintiff's automobile, to hypothesize that defendant should have remained in a stopped position south of the highway was at least an unnecessary deviation from MAI 17.14 and prejudicial error will be presumed unless it is made perfectly clear that no prejudice could have resulted to the defendant thereby. *Brown v. St. Louis Public Service Co.,* 421 S.W.2d 255, 259[3] (Mo. banc 1967); *Offenbacker v. Sodowsky,* 499 S.W.2d 421, 424[2, 3] (Mo.1973).

No such clear showing of lack of prejudice appears, and the plaintiff's arguments on this point are not convincing. On the other hand, the inherent prejudice and error in Instruction No. 4 are obvious. The instruction, as given, was a clear invitation to the jury to find that plaintiff entered a position of immediate danger at a point 320 feet west of the point of impact. Such an invitation is at war with both the facts and the law applicable in this case, extends the zone of peril far beyond permissible limits, and obviously was highly prejudicial to the defendant.

Other reasons asserted by the defendant as to the error in Instruction No. 4 need not be detailed. The trial court properly granted the defendant a new trial because of error in Instruction No. 4.

The judgment is affirmed.

All concur.